### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| **ASHLY RODRIGUEZ, and** | ) | |
| **MADELLINE MELENDEZ,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:19 CV 44** |
| | ) | |
| **JUDA PARKS, and** | ) | |
| **THE CITY OF EAST CHICAGO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### OPINION and ORDER

This matter is before the court on the motion of defendant the City of East Chicago for summary judgment on all claims. (DE # 55.) For the reasons set forth below, the motion is granted.

### I.      BACKGROUND

In 2018, plaintiffs Ashly Rodriguez and Madelline Melendez were trainees in the East Chicago Police Department's officer training program. Defendant Juda Parks was a sergeant in the Department, and one of many Field Training Officers ("FTOs"). Trainees accompanied FTOs for a training period that was supposed to last around three months; the FTOs that were assigned to trainees varied every few weeks. (Rodriguez Dep. 16:4-9, 24-25; 17:1-5; 48:20-25.) Following the FTO training period, trainees engaged in "shadow" training with an officer for several additional weeks. (*Id.* at 16:11-12; 40:20-25.) FTOs submitted observation reports, and their cumulative assessment influenced whether a trainee was able to move onto the next phase of training. (Melendez Dep. 67.)

Melendez began her FTO training in October of 2018. (*Id.* at 18:8-10.) Parks was not assigned as one of Melendez's FTOs, but he ended up serving as a "stand-in" FTO for approximately ten days of her three-month training. (*Id.* at 19:3-8; 73:13-20.) Melendez alleges that Parks asked her for nude photographs while she was inside a police car with him during the FTO program. (*Id.* at 20-21.) Parks then said "you owe me," that he was in charge of her, and that he was the person who determined what went on her reviews. (*Id.*) Melendez further alleges that Parks "said that he was going to ask me again, and do I want to send him nude pictures." (*Id.* at 27-28.) Melendez claims that, "[a]fter I didn't say anything and wouldn't give him any nude pictures, he began to try to embarrass me on calls and reprimand me in front of other officers and, ridicule me . . . And as far as teaching me during the FTO process, the amount of information he offered me dropped significantly." (*Id.* at 33:13-20.)

Melendez alleges that Parks's behavior was not limited to the days he was serving as her FTO. (*Id.* at 29:16.) She claims that defendant once commented that she did not have a butt in her uniform pants. (*Id.* at 30:6-9.) She also alleges that defendant would grab the front of her uniform, pull her, put his arm around her, and tell her "come here" while she tried to keep her distance. (*Id.* at 29:8-10.) Melendez claims that she had to hide from defendant and was afraid to come to work. (*Id.* at 29:22-25.)

Melendez claims that she reported Parks behavior to Parks himself by telling him that she did not like it when he grabbed her by her uniform. (*Id.* at 22:22-25, 23:1-6;

63:11-22; 71:3-11.) It is undisputed that Melendez did not report any of Parks's behavior to anyone else. (*Id.* at 35:7-12.)

On December 30, 2018, the Hobart Police Department responded to a domestic incident involving Melendez and Mitchell Tipton, another officer with the East Chicago Police Department. (DE # 53-8.) Frank Smith, then-Chief of the East Chicago Police Department, reviewed the Hobart Police Department's report regarding the incident and determined that neither Melendez nor Tipton should continue employment with the department. (Smith Dep. 7:4-6; 23:1-10.) Both officers resigned. (*Id.*) Melendez submitted her resignation on January 14, 2019. (DE # 57-8.) Melendez contends that Tipton has since been re-hired. (DE # 84.)

Parks served as one of Rodriguez's assigned FTOs. Rodriguez claimed that Parks made comments about her body; in response, she laughed and said thank you. (DE # 57-3 at 1; Rodriguez Dep. 145:2-7.) She further attested that Parks put his arm around her every time she punched the time clock and asked her what she saw in the mirror when she was naked. (Rodriguez Dep. 27:18-24.) Rodriguez also testified that Parks asked her for nude photos during the first few weeks of her FTO training. (*Id.* at 17:18-25.) She testified that she said nothing in response, because "[w]hat do you do when your sergeant and your FTO asks you for nude pictures and your job is on the line at that point? . . . Because if I don't give it to him, he could just write any reports and fire me." (*Id.* at 13:1-9.) Rodriguez further testified that Parks told her that she "owed" him

nude pictures five or six weeks later. (*Id.* at 62, 64.) She never provided him with any pictures. (*Id.* at 78:17-18.)

Parks was also initially involved in Rodriguez's shadow phase (*id.* at 17:14-17), but Rodriguez asked to switch to another training officer. (*Id.* at 19:1-15.) Rodriguez asked for this change because she felt uncomfortable with Parks and did not want to be asked for nude photos. (*Id.* at 19:5-7.) However, Rodriguez did not tell anyone that this was the reason for her request. (*Id.*) The request was granted. (*Id.*) Rodriguez's training took a month longer than she expected. (*Id.* at 21:9-14.) She ultimately completed training in July or August of 2018. (*Id.* at 21:14.) Thereafter, Rodriguez served as a patrol person.[1] (*Id.* at 15-20.)

About a month after completing her FTO program, Rodriguez began working a "side job" providing security at a local school. (*Id.* at 99:15-25.) According to Vince Balbo, the school's Director of Security, officers were not on duty for the East Chicago Police Department when they worked at the school. (Balbo Dep. 10:5-8.) Rodriguez received a separate W-4 for her work at the school and was issued a separate paycheck from a different corporate entity. (Rodriguez Dep. 103.) Parks was the police department point-person who was in charge of scheduling officers to work hours at the school. (*Id.* at 100:4-18.)

---

[1] Rodriguez remains employed by the East Chicago Police Department on reserve status. (Rodriguez Dep. 8:16-18.)

On December 24, 2018, Rodriguez told Sergeant Kevin Harretos about Parks's harassment. (*Id.* at 69.) That same day, Rodriguez drafted a "To/From," an internal departmental memorandum, and submitted it to Sergeant Harretos as her formal complaint regarding Parks's behavior. (*Id.* at 143:24-144:3.) Rodriguez claims that once she submitted her "To/From" to Harretos, she did not receive any more hours at the school. (DE # 58 at 25-26.)

Rodriguez's "To/From" made its way to Chief Smith. (Smith Dep. 15:1-6.) In early January, Chief Smith called Laura Corpus, the City's Human Resources Director, to inform her of Rodriguez's complaint. (Corpus Dep. 16.) Corpus met with Rodriguez regarding the allegations on January 7, 2019. (*Id.* at 14.) Corpus told Rodriguez that she hoped to get back to her about the investigation in about a month. (*Id.* at 120:8-11.) Parks was temporarily relieved of training duties. (Smith Dep. 19:18-22; 23:21-23.) Corpus began interviewing all female employees about whether they had experienced harassment from Parks.[2] (Corpus Dep. 41.)

On January 15, 2019, both Rodriguez and Melendez filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (DE ## 57-5, 57-6.) On January 26, plaintiffs filed the present federal lawsuit. (DE # 1.) Corpus suspended her investigation at the onset of litigation. (Corpus Dep. 24:1-12.)

---

[2] Corpus testified that she did not interview Melendez because Melendez had resigned on January 14. (*Id.* at 38:15.)

Plaintiffs' suit names both Parks and the City of East Chicago as defendants. (DE ## 1, 12.) Plaintiffs allege that they were deprived of their constitutional rights in violation of Title 42, Section 1983, and their civil rights as protected by Title VII of the Civil Rights Act of 1964, Title 42, Section 2000e. (DE # 12.) The court previously denied Parks's motion for summary judgment on plaintiffs' Section 1983 claims against him, personally. (DE # 69.) The City now moves for summary judgment on all claims against it. (DE # 55.)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 allows for the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). "[T]he burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325.

In responding to a motion for summary judgment, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *Palmer v. Marion County,* 327 F.3d 588, 595 (7th Cir. 2003). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson,* 477 U.S. at 248; *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 550 U.S. 372, 380 (2007).

## III.    DISCUSSION

### A.    Title VII: Hostile Work Environment Claim against the City

"Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Vance v. Ball State Univ.,* 570 U.S. 421, 426 (2013) (quoting 42 U.S.C. § 2000e–2(a)(1)). Hostile or abusive work environments are forms of sex discrimination actionable under Title VII. *Lapka v. Chertoff,* 517 F.3d 974, 982 (7th Cir. 2008).

To establish a claim of hostile work environment based on sex, a plaintiff must establish that she was (1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability. *Paschall v.*

7

*Tube Processing Corp.,* 28 F.4th 805, 812–13 (7th Cir. 2022). In this case, the court begins with the last element – the existence of a basis for employer liability – as it is dispositive.

Under Title VII, employers can be vicariously liable for harassment that occurs in the workplace, but harassment by supervisors is treated differently than harassment by co-workers. *Parkins v. Civ. Constrs. of Ill., Inc.,* 163 F.3d 1027, 1032 (7th Cir. 1998). If the harassment came from the victim's supervisor, then the employer is strictly liable, subject to the possibility of an affirmative defense. *Rhodes v. Ill. Dept. of Transp.,* 359 F.3d 498, 505 (7th Cir. 2004)*, overruled in part on other grounds by Ortiz v. Werner Enters., Inc.,* 834 F.3d 760 (7th Cir. 2016). If the harassment was caused by a co-worker, then an employer is only liable if the claimant can prove that the employer "has been negligent either in discovering or remedying the harassment." *Id.* at 505–06. Thus, before the court may determine whether a basis for employer liability exists, it must first determine whether Parks was a "supervisor" for purposes of Title VII. *Parkins,* 163 F.3d at 1032.

An employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim. *EEOC v. Vill. at Hamilton Pointe LLC,* 102 F.4th 387, 405 (7th Cir. 2024). In other words, a supervisor is one with the power to directly affect the terms and conditions of employment, including the "authority to hire, fire, promote, demote, discipline or transfer" a plaintiff. *Id.* "Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes [of] imputing liability to the employer." *Parkins,* 163 F.3d at 1034.

8

In this case, the City argues that Parks's role as FTO was not "supervisory" in the Title VII sense. It is undisputed that Parks could not hire, fire, or discipline plaintiffs. The City further points out that, while FTOs assessed the performance of trainees, Parks was one of several FTOs who trained Rodriguez, and that Parks only served as Melendez's FTO for approximately 10 days. (Rodriguez Dep. 48; Melendez Dep. 67.) Plaintiffs, on the other hand, argue that Parks – a sergeant – ranked higher than plaintiffs and wielded power over them in the sense that he could withhold useful information and impact how and when trainees moved through the phases of training. (DE # 58 at 7, 10.)

As the Seventh Circuit has explained, an employee who "merely ha[s] authority to oversee aspects of another employee's job performance does not qualify as a supervisor" for Title VII purposes. *Rhodes*, 359 F.3d at 506; *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002), *overruled in part on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). For example, in *Hall*, the Seventh Circuit found that an employee who possessed authority to direct plaintiff's work operations, provided input into her performance evaluations, and was charged with training her and other less experienced employees was not a supervisor, as he lacked "the authority to hire, fire, demote, promote, transfer, or discipline." 276 F.3d at 355. Similarly, in *Rhodes*, the Seventh Circuit held that employees who "managed [plaintiff's] work assignments, investigated complaints and disputes, and made recommendations concerning

sanctions for rule violations" were not supervisors, as they lacked "the authority to hire, fire, promote, demote, discipline or transfer." 359 F.3d at 506.

Like in *Hall* and *Rhodes,* the record in this case lacks facts from which a reasonable inference can be drawn that Parks was a "supervisor" for Title VII liability purposes. While Parks clearly provided input into plaintiffs' evaluations, was charged with training them, and managed aspects of their work assignments, Parks was not empowered to affect plaintiffs through tangible employment actions such as hiring, firing, or disciplining. *See Hall,* 276 F.3d at 355; *Rhodes,* 359 F.3d at 506. At most, Parks "merely had authority to oversee aspects of [plaintiffs'] job performance"; he therefore "does not qualify as a supervisor" for Title VII purposes. *Rhodes,* 359 F.3d at 506. Accordingly, the court will apply the co-worker harassment framework in this case.

As stated previously, an employer is liable for a co-worker's harassment under Title VII only if it has been negligent in discovering or remedying the harassment. *Rhodes,* 359 F.3d at 505–06. Thus, an employer's legal duty in co-worker harassment cases is discharged if it takes "reasonable steps" to discover and rectify acts of harassment of its employees. *Clacks v. Kwik Trip, Inc.,* 108 F.4th 950, 957 (7th Cir. 2024). Because the alleged harassment in this case came from a co-worker, rather than a supervisor, plaintiffs bear the burden of proof on this point. *Shaw v. AutoZone, Inc.,* 180 F.3d 806, 812 n.2 (7th Cir. 1999); *Taylor v. State of Ill.,* No. 98 C 4637, 2000 WL 44996, at *4 (N.D. Ill. Jan. 11, 2000) ("[I]t is plaintiff's burden to show [that] the defendant's agents

knew or should have known of the harassment and, if they did not know, that they were negligent in not knowing.").

### 1.    *Negligence in Discovering Harassment*

An employer must take reasonable steps to discover co-worker harassment. *Clacks,* 108 F.4th at 957. However, because an employer is not omniscient, it must have notice or knowledge of the harassment before it can be held liable. *Hamilton Pointe LLC,* 102 F.4th at 403. In determining whether an employer had notice of harassment, the court should consider whether the employer has designated a channel for complaints of harassment. *Parkins,* 163 F.3d at 1035. An employee need not specifically comply with an employer's procedure so long as the employer is adequately put on notice of the prohibited harassment. *Hamilton Pointe,* 102 F.4th at 403.

The City points out that it maintains an employee handbook; the version relevant to this case was revised in December 2015 and contains a four-page sexual harassment policy. (DE # 57-12.) That policy states: "Any employee who reasonably believes that he/she has either witnessed or been subjected to sexual harassment shall immediately report the discriminatory conduct to their supervisor or any member of the City's Human Resources or Law Departments. All complaints will be documented in writing." (*Id.* at 38.) The policy further reiterates that "[a]n employee has the option of reporting any violations of this policy to: (1) the Department Head in which the Employee works; (2) the City of East Chicago's Director of Human Resources; or (3) any other Department Head, as desired by the employee. The employee should report the

discriminatory, harassing or retaliatory conduct to someone other than the person engaging in the offensive conduct." (*Id.* at 39.)

Rodriguez testified at her deposition that she received and read the City's handbook, and that she understood the City's designated channels for complaints of harassment.[3] (Rodriguez Dep. 28:9-17.) Indeed, she utilized one of these channels when she reported Parks's conduct to Sergeant Harretos on December 24, 2018. (DE # 57-3.) Melendez insisted that she complied with the handbook by reporting Parks to Parks himself. (DE # 58 at 8.) Interestingly, counsel for plaintiffs simultaneously argues that plaintiffs never received a handbook at all. (*Id.*) Regardless, even if plaintiffs never received a handbook, that fact does not raise a genuine issue of fact regarding whether the City was negligent in this case. Both plaintiffs testified that they knew how to report sexual harassment in the department. (Rodriguez Dep. 31:5-25; 33:5-24; Melendez Dep. 22:22-25, 23:1-6; 63:11-22; 71:3-11.)

Plaintiffs argue that other facts point to the City's negligence in discovering Parks's harassment. First, plaintiffs argue that Parks had a reputation as a bully. (DE # 58 at 23.) As proof, plaintiffs cite the fact that Parks received a plea deal in a prior criminal proceeding involving tax fraud. (*Id.*) This argument is rejected; no reasonable

---

[3] Counsel for plaintiffs attempts to walk back Rodriguez's admissions by arguing that the exchange with opposing counsel during the deposition about the employee handbook should be taken as "rhetorical." (DE # 58 at 8.) However, counsel cannot create an issue of fact in a response brief by attempting to contradict his own client's prior deposition testimony. *Hickey v. Protective Life Corp.,* 988 F.3d 380, 389 (7th Cir. 2021).

fact finder could infer that the City knew or should have known about Parks's alleged harassment because Parks had a history of tax issues. Second, plaintiffs argue that the City lacks proof that Parks received the most recent round of the police department's sexual harassment training. (DE # 58 at 18.) However, plaintiffs have the burden of proof to demonstrate the City's negligence. *Shaw,* 180 F.3d at 812. Even if Parks did not receive the most recent round of the department's sexual harassment training, that alone would not create a genuine issue of fact regarding whether the City was negligent in uncovering workplace harassment. Indeed, the City maintained a sexual harassment reporting protocol, which plaintiffs argue they employed. Simply put, plaintiffs have not met their burden of demonstrating that the City failed to take any reasonable steps towards discovering workplace harassment.

Melendez argues that she can prove that the City knew or should have known that Parks sexually harassed her in two additional ways. First, Melendez argues that she followed the City's sexual harassment reporting procedure by complaining about Parks to Parks himself, whom she believed was her supervisor, but nothing came of it. (Melendez Dep. 22:22-25, 23:1-6; 63:11-22; 71:3-11.) From this fact, Melendez argues, negligence is apparent. However, this argument fails because Melendez's complaint to Parks only consisted of her statement that she did not like him grabbing the front of her uniform. (*Id.* at 22:22-25, 23:1-6; 63:11-22; 71:3-11.) As the Seventh Circuit has explained, an employee usually must make a "concerted effort to inform the employer that a problem exists." *Nischan v. Stratosphere Quality, LLC,* 865 F.3d 922, 931–32 (7th Cir. 2017)

13

(internal quotation marks omitted). No reasonable inference can be made that Melendez made a "concerted effort" to put the City on notice as to Parks's harassing behavior (i.e., inappropriate comments and requests for nude photos) when she informed Parks that she did not like him grabbing the front of her uniform.

Second, Melendez suggests that the City knew or should have known about Parks's behavior towards her when it received Rodriguez's "To/From" on December 24, 2018. (DE # 58 at 20.) However, Rodriguez's "To/From' contains no reference to the experience of Melendez (or any other officers) whatsoever. (DE # 57-3.) Rodriguez also testified that she never notified the City about the harassment Melendez experienced. (Rodriguez Dep. 108:1-4.) Thus, Melendez has not created any issue of fact regarding whether the City was negligent with respect to discovering Parks's harassment.

### 2.    *Negligence in Remedying Harassment*

Even if an employer acts reasonably with respect to discovering co-worker harassment, a basis for employer liability may be established if a plaintiff can show that her employer was negligent with respect to remedying harassment. *See Hamilton Point,* 102 F.4th at 405. An employer acts reasonably in remedying harassment if, upon becoming aware of the situation, it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring. *Id.*

Regarding Melendez's case, the court must emphasize at the outset that an employer's responsibility to engage in remedial action is premised upon "becoming aware of the situation." *Hamilton Point,* 102 F.4th at 405. As explained above, neither

14

Melendez's complaint about Parks to Parks, himself, nor Rodriguez's "To/From" could reasonably have put the City on notice of the harassment Melendez claims she was experiencing. The facts taken in a light most favorable to Melendez demonstrate that, at the earliest, Melendez put the City on notice of Parks's harassment when she filed her EEOC charge on January 15. This occurred *after* she resigned on January 14. The court cannot find that the City failed to take prompt and appropriate action to prevent future harassment against Melendez in the workplace when Melendez did not inform the City of the issue until she was no longer in the workplace.

As for Rodriguez, the facts taken in a light most favorable to her suggest that, at the earliest, the City was notified of Parks's harassment of her when Rodriguez submitted her "To/From" to Sergeant Harretos on December 24, 2018. (Rodriguez Dep. 79:5-8.) Rodriguez advances two main arguments in support of her contention that the City was negligent in remedying Parks's harassment after it learned of the allegations: (1) the investigation was never completed, and (2) Corpus's file on this matter was messy (*see, e.g.,* DE # 58 at 20, calling Corpus's file a "hodgepodge of 'stickie notes' and unnumbered, disorganized papers").

No reasonable fact-finder examining the record could conclude that the City was negligent in responding to Rodriguez's allegations. The fact that the investigation did not conclude in a way that Rodriguez found satisfactory does not create an issue of fact. Perhaps she would have preferred that Parks receive a formal reprimand or punishment; however, "the emphasis of Title VII in this context is not on redress but on

the prevention of future harm." *Hamilton Point,* 102 F.4th at 405 (internal citation omitted). The City's decision to interview other female officers and place Parks on temporary leave from training duties was reasonably calculated to prevent future harm. *Clacks,* 108 F.4th at 957–58 (employer discharged its legal duty by promptly reassigning Clacks to a new trainer); *Paschall,* 28 F.4th at 813 (employer discharged duty by reassigning the plaintiff to a job away from the harassing coworker).

Further, the fact that plaintiffs would have preferred another approach – perhaps with tidier record-keeping – does not create an issue of fact. *See Parkins,* 163 F.3d at 1036 ("Although [plaintiff] complains that Civil Constructors' efforts could have been more thorough, its investigation and punishment of the harassers was 'both timely and reasonably likely to prevent the conduct underlying her complaint from recurring.' Nothing more is required."). Plaintiffs were not entitled to perfection; only a *negligent* employer will be held vicariously liable for the harassment of an employee by a co-worker. *Rhodes,* 359 F.3d at 505.

As the above analysis demonstrates, plaintiffs have established no genuine issues of material fact regarding whether the City failed to take "reasonable steps" to discover or remedy the harassment of co-workers. *Clacks,* 108 F.4th at 957. Therefore, they cannot establish a basis for employer liability, an essential element of their Title VII claim. *Paschall,* 28 F.4th at 813. For this reason, summary judgment is appropriate as to plaintiffs' Title VII hostile work environment claim against the City.

**B.      Title VII: Retaliation Claim against the City**

Title VII prohibits an employer from retaliating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." *Lesiv v. Illinois Cent. R.R. Co.,* 39 F.4th 903, 911 (7th Cir. 2022) (quoting 42 U.S.C. § 2000e-3(a)). To establish a Title VII retaliation claim, a plaintiff must ultimately show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between her protected expression and the adverse action. *Fuller v. McDonough,* 84 F.4th 686, 690 (7th Cir. 2023). An adverse action is one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity. *Lesiv,* 39 F.4th at 911–12. The action must rise above "trivial harms," such as "petty slights or minor annoyances that often take place at work and that all employees experience," which do not qualify as materially adverse. *Id.*

The court begins with Melendez's claim of Title VII retaliation, in which she contends that she was forced to resign after she complained of harassment. (DE # 58 at 29.) As discussed above, Melendez's first possible notice to the City about harassment would have come when she filed her EEOC charge on January 15, 2019. She resigned the day before, on January 14, 2019. Accordingly, no causal link exists between the filing of her charge and her allegedly-forced resignation. *Durkin v. City of Chi.,* 341 F.3d 606, 614–15 (7th Cir. 2003) ("[I]t is axiomatic that a plaintiff [must] engage in statutorily protected activity before an employer can retaliate against [him] for engaging in

statutorily protected activity . . .  An employer cannot retaliate if there is nothing for it to retaliate against."); *Walker v. Mueller Indus., Inc.,* 408 F.3d 328, 332 (7th Cir. 2005) (because purported adverse assignment occurred before plaintiff began to complain of discrimination, the timing of events was inconsistent with retaliation).[4]

Most of Rodriguez's allegations also fail based on timing alone. Rodriguez's statutorily protected expression occurred, at the earliest, on December 24, 2018, the date on which she informed Sergeant Harretos of her experiences. (DE # 57-3.) Though Rodriguez argues that she engaged in statutorily protected expression much earlier when she asked to switch to another shadow phase trainer (DE # 58 at 16), she also admitted that she "never revealed the real reason as to why I wanted to be switched[.] I told Hector Rosario . . . that I just didn't like [Parks's] way of training." (DE # 57-3.) General grievances and complaints do not establish statutorily protected expression. *Anderson v. Street,* 104 F.4th 646, 654–55 (7th Cir. 2024) (employee's statements in email that "men at [the employer's restaurant] do and say very inappropriate things" and that the environment is "degrading for women" was too general and unconnected to purported sexual harassment to rise to the level of protected activity); *cf. McHale v. McDonough,* 41 F.4th 866, 872 (7th Cir. 2022) ("The complaints were about mistreatment during the promotion process and her sick leave restrictions, neither of which

---

[4] Melendez again argues that the City was on notice of her complaints when Rodriguez submitted her "To/From" on December 24, 2018. However, as explained previously, the substance of Rodriguez's "To/From" does not allow such an inference (DE # 57-3), and Rodriguez testified that she never notified the City of Melendez's experiences. (Rodriguez Dep. 108:1-4.)

implicated disability discrimination. Therefore, they were not statutorily protected activity in this case.").

Because Rodriguez's statutorily protected activity occurred on December 24, 2018, at the earliest, a causal link cannot be established to support a retaliation claim based on any adverse actions she alleges she suffered before that date. *Durkin,* 341 F.3d at 614–15; *Walker,* 408 F.3d at 332. Specifically, Rodriguez cannot base her retaliation claim on her allegation that she received diminished amounts of information from Parks during FTO training, nor her contention that her FTO training lasted one month longer than it should have. It is undisputed that Rodriguez completed her FTO training in July or August of 2018, well before she submitted her December 24, 2018, "To/From." (Rodriguez Dep. 21:9-14.)

Rodriguez also claims that she was retaliated against when the City decided not to place Parks on leave after she complained; as a result, she felt uncomfortable in the workplace. (Rodriguez Dep 36-37.) However, these facts fail to establish an adverse action to support a retaliation claim. *Wren v. Chrysler Grp., LLC,* No. 1:13-CV-00026-SEB, 2015 WL 1417795, at *11 (S.D. Ind. Mar. 27, 2015) *(*adverse action not established for purposes of retaliation claim where plaintiff felt "intimidated" and "uncomfortable" by alleged harasser's presence in common areas).

Finally, Rodriguez argues that she lost shifts at her "side job" working security at a local school as a result of her complaint regarding Parks, because Parks was the police department staffer who created the school's security staff schedule. (DE # 58 at 25-26.)

However, the Seventh Circuit has held that a Title VII retaliation claim cannot be

supported when an employee is denied a discretionary benefit to which she is not

automatically entitled. *Hottenroth v. Vill. of Slinger,* 388 F.3d 1015, 1033 (7th Cir. 2004).

Even the denial of a monetary perk, such as a bonus or reimbursement of expenses,

does not constitute an adverse action if it is "wholly within the employer's discretion to

grant or deny and is not a component of the employee's salary." *Id.* at 1030. In this case

Rodriguez admits that her hours working at the school were sporadic and not

guaranteed. (Rodriguez Dep. 124:11-23.) Thus, Rodriguez's allegations that she was

unable to benefit from the additional income of shifts at a "side job" outside the police

department fail to support her Title VII retaliation claim.

**C.    Section 1983: Equal Protection Claim against the City**

As noted previously, in a separate opinion this court allowed plaintiffs' Section

1983 claims against Parks, personally, to proceed past the summary judgment phase

towards trial. (DE # 69.) However, the City's motion for summary judgment on

plaintiffs' Section 1983 claim will be granted.

Section 1983 is the legal mechanism that allows plaintiffs to seek recovery for

violations of their constitutional rights. *Spiegel v. Rabinovitz,* 121 F.3d 251, 254 (7th Cir.

1997). Unlike Title VII, Section 1983 does not permit a municipality to be held

vicariously liable for an employee's wrongdoing. *Monell v. New York City Dept. of Soc.

Servs.,* 436 U.S. 658, 690-91 (1978) ("[A] municipality cannot be held liable [under

Section 1983] solely because it employs a tortfeasor."). Instead, municipal liability under

20

Section 1983 is limited to actions for which the municipality is actually responsible. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 470 (1986). The Seventh Circuit has explained that three bases for municipal liability exist: (1) an express policy, (2) a widespread practice so well-settled it becomes a custom, or (3) a person with final policymaking authority for the local governmental body." *Spiegel v. McClintic,* 916 F.3d 611, 617 (7th Cir. 2019).

The City noted the lack of evidence supporting plaintiffs' Section 1983 claim against it as a municipality in its motion for summary judgment (DE # 56 at 24), but plaintiffs did not respond directly to the argument, focusing instead on Parks's personal liability (DE # 58 at 11-16.) In any event, plaintiffs have not pointed to (and the court cannot itself discern) any genuine issue of material fact regarding whether the City employed a policy or widespread custom that was responsible for a deprivation of plaintiffs' constitutional rights, nor whether an individual with final policy-making authority caused their constitutional rights to be deprived. Accordingly, summary judgment is appropriate on this claim.

### D.    Section 1983 : First Amendment Retaliation Claim against the City

The First Amendment, made applicable to the states through the Fourteenth Amendment, prohibits the government from retaliating against its employees for engaging in protected speech. *Gross v. Town of Cicero, Ill.,* 619 F.3d 697, 703–04 (7th Cir. 2010). A claim for First Amendment retaliation under Section 1983 involves a three-step inquiry: (1) whether the employee's speech was constitutionally protected; (2) whether

the protected speech was a but-for cause of the employer's action; and (3) whether the employee suffered a deprivation because of the employer's action. *Kodish v. Oakbrook Terrace Fire Protection Dist.,* 604 F.3d 490, 501 (7th Cir. 2010).

In this case, the court need not proceed beyond the first inquiry. The Seventh Circuit has stated that, although sexual harassment is indeed an important matter that can be of public concern, purely personal grievances regarding sexual harassment do not garner First Amendment protection. *Gross,* 619 F.3d at 706. For this reason, expressing one's own experiences about sexual harassment in the workplace is typically not protected by the First Amendment. *See, e.g., Corona v. City of Chicago,* No. 21 CV 6777, 2023 WL 5671661, at *6 (N.D. Ill. Aug. 31, 2023) (reporting sexual assault and workplace harassment to internal and external investigatory entities is not speech protected by First Amendment); *Barth v. Vill. of Mokena,* No. 03 C 6677, 2004 WL 434195, at *3 (N.D. Ill. Feb. 25, 2004) (plaintiff's complaint to supervisors did not touch upon a matter of public concern because it was based on her own experiences and was motivated by desire to stop the harassment and discrimination). In this case, there is no genuine issue of material fact regarding whether plaintiffs' sexual harassment complaints constituted constitutionally-protected speech on matters of public concern. Accordingly, summary judgment is appropriate on this claim.

## IV.    CONCLUSION

For the foregoing reasons, the City of East Chicago's motion for summary

judgment (DE # 55) is **GRANTED**. Because plaintiffs' Section 1983 claim against Parks

remains, the court withholds entry of final judgment.

**SO ORDERED.**

Date: February 26, 2025

s/James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT

23